# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| ANTHONY J. MARQUES and | : | Bankruptcy No. 05-31854DWS |
| ELENA M. MARQUES, | : | |
| | : | |
| Debtors. | : | |
| | | |
| ANTHONY J. MARQUES, | : | Adversary No. 07-0207 |
| ELENA M. MARQUES, | : | |
| | : | |
| Plaintiffs/Counter-Defendants, | : | |
| | : | |
| v. | : | |
| | : | |
| BANK OF AMERICA, N.A., successor-in-interest | : | |
| by merger to Fleet National Bank, and successor-in- | : | |
| interest by merger to Progress Bank [dsm'd on 8/22/07], | : | |
| | : | |
| Defendant, | : | |
| | : | |
| GREAT PLAINS CAPITAL CORPORATION, | : | |
| Assignee to Bank of America, N.A., | : | |
| | : | |
| Defendants/Counter-Claimant. | : | |

# MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, United States Bankruptcy Judge**

Before the Court is the Amended Complaint (the "Complaint") of the debtors Anthony J. Marques ("Anthony") and Elena M. Marques ("Elena" and together with Anthony, "the Marques") against Great Plains Capital Corporation (the "GPCC").

By agreement Bonnie B. Finkel, the Chapter 7 trustee (the "Trustee" and together with Marques, "Plaintiffs") was added as a named plaintiff to the extent of the estate's interest in the Debtors' claims.[1] In the Complaint, Plaintiffs seek a determination of the validity, priority and extent of GPCC's lien or security interest on the Marques' residential real estate pursuant to § 506(a) and Bankruptcy Rules 3012 and 7001. However, because the mortgage at issue was marked satisfied during the pendency of the adversary proceeding, GPCC sought and was granted leave to amend its answer and file a counterclaim to determine the validity of the mortgage and to set aside the satisfaction piece as erroneously recorded.

After trial of the adversary proceeding and submission of briefs by the parties, the matter is ripe for adjudication.

**BACKGROUND**

At issue in this adversary proceeding are three secured loans made to Metro UTC, LTC ("Metro"), a defunct corporation of which Anthony was principal.[2] The first loan in the amount of $375,000 is evidenced by a promissory note ("Note I") issued by Progress Bank ("Progress") and dated July 11, 2003. Exhibit P-2. The proceeds of this loan were used to satisfy Metro's indebtedness in the amount of $346,634.80 to Penn Business Credit, Inc. that had been the factor for Metro's receivables, Exhibits P-3 and P-4, and

---

[1] Also by stipulation dated August 15, 2007, Bank of America, N.A. ("B of A") was voluntarily dismissed. Doc. No. 8. As noted below, GPCC is the current holder of the loans at issue but the migration began before B of A became involved.

[2] Metro, a utility construction business, ceased operations in May 2005 and was the cause of the Marques' financial problems. Elena was not involved in Metro's operations.

-2-

to provide a line of credit for its business operations.[3] Anthony contemporaneously executed and delivered a Commercial Guaranty which was unlimited in amount and continuing. Exhibit P-7. Also contemporaneously, the Marques executed and delivered (1) a Commercial Pledge and Security Agreement (the "Pledge Agreement") whereby they assigned their interest in a certain Merrill Lynch Brokerage Account (the "Securities") and (2) an Open-End Mortgage relating to the Marques' residence at 1600 Shepard Drive, Maple Glen, PA (the "Residence") as security for the repayment of Note I[4] as well as additional future advances given to Metro. Exhibit P-10. Notably the Open-End Mortgage contains the following clause (the "Cross-Collateralization") upon which GPCC relies:

> **CROSS-COLLATERALIZATION.** In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower or any one or more of the, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any stature of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

Id.[5] The Cross-Collateralization is broad and general befitting its characterization as a dragnet clause. However, it is supplemented by the following language in bold:

---

[3] After the satisfaction of Penn Business Credit, there was $28,365.20 of undisbursed funds apparently available to draw upon.

[4] This was the same collateral which had been provided to Penn Business Credit which upon payment from the proceeds of Note I, released its interests in the Residence and Securities.

[5] Both Anthony and Elena initialed that part of the document to acknowledge the Cross-Collateralization.

> **REVOLVING LINE OF CREDIT. Specifically, in addition to the amounts specified in the Indebtedness definition, and without limitation, this Mortgage secures a revolving line of credit, which obligates lender to make advances to Borrower unless Borrower fails to comply with all the terms of the Note.**
>
> ....
>
> **Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or related documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage....

Exhibit P-10 (Emphasis in original). The Pledge Agreement executed with respect to the Securities contains the precise cross-collateralization language quoted above, also initialed by the parties, but omits the reference to the Revolving Line of Credit and contains a more limited definition of "Indebtedness." Exhibit P-5.

The second loan in the amount of $650,000 is evidenced by Progress Bank Business Loan Agreement and SBA Promissory Note ("Note II"). Exhibit P-15 and 16. While the documents are unsigned and undated, the parties agree that they evidence the second loan made to Metro on or about September 9, 2003. Joint Pretrial Statement, Uncontested Facts ("Uncontested Facts") ¶ 5. Metro provided a Commercial Security Agreement to secure Note II, Exhibit P-17, but no new security documents were provided by the Marques. Nor is there specific reference in any of the documents memorializing the loan evidenced by Note II to any previous grant of personal collateral by the Marques. The second loan was guaranteed by the Small Business Association which authorized the

proceeds to be used for the purchase of equipment ($307,651.06) and working capital ($328,844.44) and reimbursement of fees ($13,504.50). Exhibits P-13 and 14.

On or about June 23, 2004, Metro executed and delivered to Fleet National Bank ("Fleet"), the successor by merger to Progress, a line of credit promissory note ("Note III") in the maximum principal amount of $375,000. Exhibit P-30. The Line of Credit Agreement (the "Note III Agreement"), Exhibit P-31, accompanying Note III, recites that Note III is also secured by "Pledge Agreement in the name of Anthony & Elena Marques" but is silent with respect to the previously mortgaged Residence. Id. ¶ VI. While there is no evidence of the contemporaneous execution by the Marques of a pledge agreement hypothecating their securities, they have stipulated that such a document was executed and delivered to Fleet on or about June 23, 2004. Uncontested Facts ¶ 8. It is undisputed that the proceeds of Note III were used to satisfy the outstanding obligations under Note I.

On November 15, 2004 Fleet granted Anthony and Elena a $200,000 home equity line of credit secured by a mortgage on the Residence. Exhibit P-34.[6]

On July 8, 2005 B of A issued two demand notices. The first stated the amount of the "Indebtedness" as $471,997.49 and recited the security therefore "as described on Exhibit A attached thereto." Attached to the document was a UCC Financing Statement evidencing its interest in Metro's equipment to secure Note II. Exhibit P-36. The second letter stated the

---

[6] While the mortgage was not made part of the record, the parties do not dispute this secured transaction. I take judicial notice that B of A, as successor to Fleet, filed a motion for relief from stay to exercise its state law remedies with respect to this mortgage lien which was not opposed by Debtor. An Order for relief was entered on June 5, 2006 to allow B of A to exercise its state law remedies against the Residence in connection with this consumer loan. Doc. No. 46. No reference to any subsequent state law action was made at the trial.

Indebtedness amount as $367,559.48 and recited as security the Pledge Agreement regarding the Securities and the Open-End Mortgage. Exhibit P-35. Anthony cooperated with B of A to auction off Metro's equipment, and the Marques consented to relief from stay in the bankruptcy case to allow liquidation of the Securities.[7] After application of these proceeds to the outstanding indebtedness, there are amounts remaining outstanding on both loans evidenced by Notes II and III.

The Marques filed this Complaint on June 12, 2007 to secure a judicial determination that the Open-End Mortgage was satisfied when Note I was paid off by the proceeds of Note III and thus the Residence does not stand as collateral security for the remaining obligations under Notes II and III. They contend that while the Residence was pledged to secure Note I, no such agreement was made with respect to Note II which was solely secured by the business assets or Note III which was secured by the business assets and the Securities.

Unbeknown to the Marques and their counsel and to GPCC and its counsel until discovery commenced in this proceeding, on August 23, 2006 a satisfaction piece with respect to the mortgage on the Residence had been recorded by the Law Offices of Gregory Javardian at the direction of Thomas McMahon, a Vice President of B of A. Uncontested

---

[7] After Metro ceased business, its machinery and equipment was liquidated but the proceeds did not fully repay Notes II and III. B of A sought and was granted, upon consent of the Debtor, relief from stay to liquidate the securities to pay down Note II and Note III. The record is not explicit as to how the proceeds were applied as to each note. GPCC now seeks to foreclose on the Residence and apply the proceeds to the remaining indebtedness.

Facts ¶ 9.  On October 24, 2006 B of A sold the Metro loans to GPCC and assigned its loan documents, including the Open-End Mortgage which, of course, had been marked satisfied at that juncture.  In an amended answer and counterclaim, GPCC seeks to have the resulting release of lien undone as a mistake, and to obtain a judicial determination that it secures Notes II and III based on the cross collateralization provisions of the aforementioned Open-End Mortgage.  While GPCC asserts that recordation of the satisfaction piece was a mistake, Plaintiffs contend it was intentional, evidencing B of A's conclusion that with the liquidation of the Securities, it had no more collateral.  The record is silent as to the reason this step was taken.[8]

Finally the Marques contend that even if I find that the Open-End Mortgage does collateralize Notes II and III, it cannot be enforced against Elena because she did not receive adequate consideration for the lien she granted.[9]  Since under Pennsylvania law, married persons own property as tenants by entireties, both spouses would have to grant the mortgage for GPCC to exercise the remedy of foreclosure.  E.g. In re Carnes, 331 B.R. 229, 232-33 (Bankr. W.D. Pa. 2005).

At the trial of this matter, testimony was elicited from Anthony as well as Joseph Campbell ("Campbell"), presently employed by B of A and formerly by Fleet and Progress, about the various loans.

---

[8] While identified as a witness for trial, MacMahon was never called.  His Affidavit attached to GPCC's Answer and Counterclaim is not part of this record.  Thus, there is only speculation as to why MacMahon directed counsel to satisfy the Open-End Mortgage.

[9] At trial Marquez counsel also argued that the Mortgage was unenforceable against Elena because she had not signed a note or guaranty.  Believing that to be a misstatement of the law, I directed Marques" counsel to brief the point.  Instead he has abandoned the argument.

-7-

**DISCUSSION**

I. Satisfaction of Mortgage

I begin with the question of whether the satisfaction of the Open-End Mortgage can be set aside on the grounds of mistake. If the Open-End Mortgage cannot be reinstated, it will not be necessary to consider whether the Cross-Collateralization therein evidences a lien granted to secure future advances under Note II and Note III nor whether Elena can be relieved from her conveyance of a lien on her interest in the Residence based on the Debtor's failure of consideration theory.

GPCC, in its Post-Trial Memorandum, cites to the well-established law of Pennsylvania[10] that a satisfaction and release of mortgage entered by mistake may be set aside and the mortgage reinstated provided that the rights of third parties are not impaired.[11] St. Clement's Building & Loan Ass'n v. McCann, 126 Pa. Super. 20, 22 (1937). The Court reasoned that:

> there is nothing so sacrosanct about the satisfaction of a mortgage that stops the truth from being shown. All that is incumbent upon the part of the plaintiff to attain the relief it seeks is to prove that the defendants were not entitled to have the mortgage satisfied. The rule is well recognized that equity will afford relief where an encumbrance has been discharged through a mistake.

Id. Plaintiffs' response is that the satisfaction of the Open-End Mortgage was no mistake but an intentional act by B of A based on its conclusion that the debt for which it was security, i.e., Note I, had been discharged.

---

[10] There is no dispute over the applicability of Pennsylvania law to the questions presented.

[11] There is no contention that any third parties would be affected by the granting of this relief.

As noted above, there is no evidence to establish why B of A directed its counsel to satisfy the Open-End Mortgage. The sole evidence on this issue was Campbell's testimony, corroborated by Anthony, that there had never been a demand to satisfy the Open-End Mortgage; indeed the parties did not address that security when Note III was executed or anytime thereafter. Thus, the satisfaction was a unilateral act never communicated to the Marques by B of A.

In Alliance Funding Company v. Stahl, 829 A.2d 1179 (Pa. Super. 2003), the Court concluded that the equitable principles underlying the relief sought by GPCC apply even where the exact nature of the mistake is not disclosed. It held that the lower court had misfocused on the appellant's failure to explain how it had mistakenly entered the mortgage satisfaction piece.[12] It, however, looked to the established fact that the mortgage debt had not been paid over one year after the satisfaction piece was executed, and found that such evidence demonstrated that the satisfaction was entered in error and, subject to rights of third parties, appellant was entitled to strike it. See also In re Burkett, 295 B.R. 776, 781

---

[12] The trial court had based its conclusion on the following erroneous reasoning:

> [Appellant] at no time offered testimony or even a scintilla of evidence as to how or why a Satisfaction Piece was or would have been entered by error. There was not a scintilla of evidence from a representative of [Appellant] as to how much of the money due to [Appellant] had been received and therefore how much remained. [Appellant] made no effort at all to explain why it took over two years to notice that the mortgage had been satisfied. No testimony was offered as to whether payments were received in the interim period between the satisfying and a much later date.

Id. at 1182.

(Bankr. W.D. Pa. 2003) (recording of satisfaction piece was erroneous as the obligation had not been paid in full).

The parties have stipulated that debt under Notes II and III is outstanding. GPCC is thus entitled to the relief it seeks on its Counterclaim if the Cross-Collateralization of the Open-End Mortgage secures that debt. I shall turn to that issue next.

## II. Determination of Secured Status

### A.

In a proceeding to determine secured status under § 506, the debtor must first overcome the presumed validity of the creditor's secured claim. Allegheny-Ludlum Brackenridge Federal Credit Union v. Fassinger (In re Fassinger), 246 B.R. 513, 520 (Bankr. W.D. Pa. 2000) (*citing* cases). The Debtor's burden was met here when he established that there was no mortgage executed when the loans evidenced by Notes II and III were made and the security for those transactions recited. Indeed as to Note II, previously granted security under a cross-collateralization clause in the Pledge Agreement was referenced but no mention was made of a previously granted mortgage on the Residence. Once the debtor satisfies this initial burden, the ultimate burden of persuasion resides with the creditor to demonstrate by a preponderance of the evidence the extent of its lien. Id. at 519-20(*citing* cases). GPCC seeks to meet that burden by establishing the applicability of the Open-End Mortgages to the future advances made pursuant to Notes II and III.

The parties have correctly stated the law applicable to the enforceability of what is commonly referred to as a "dragnet clause," i.e., one that allows a lender to secure future

advances with previously-pledged collateral. Such clauses are disfavored, especially with respect to real estate because they operate as secret liens and cloud title. However they are enforceable in Pennsylvania if the advances provided are related to the purpose of the original loan. Potomac Coal Company v. $81,961.13 In the Hands of an Escrow Agent, 679 A.2d 800, 804 (Pa. Super. 1996). See also In re Gibson, 249 B.R. 645, 655 (Bankr. E.D. Pa. 2000) (*citing* cases). The relatedness rule is intended to protect against overreaching lenders who seek to bring under their collateral grants debts that are unrelated to the financing that gave rise to the security. Fassinger, 246 B.R. at 520-21 (*quoting* Kittmitto v. First Pennsylvania Bank N.A., 518 F.Supp. 297, 301 (E.D. Pa. 1981)). "[N]o matter how the clause is drafted, the future advances to be covered must 'be of the same class as the primary obligation ... and so related to it that the consent of the Debtor to its inclusion may be inferred.'" Potomac Coal, 679 A.2d. at 804 (*quoting* 2 G. GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY, § 3513, at 932 (1965)).[13]

---

[13] Potomac Coal dealt with security interests in personal property, holding that pre-Uniform Commercial Code ("UCC") law regarding dragnet clauses was still viable after the adoption of the UCC. Gilmore's language was embraced by the bankruptcy court in Gibson, a real estate case, in which the bankruptcy judge followed his own decision in In re Shapiro, 109 B.R. 127, 134 (Bankr. E.D. Pa. 1990) wherein he fashioned a four factor test to measure relatedness as follows: (1) whether the indebtedness allegedly covered by the mortgage containing the dragnet clause is specifically expressed therein; (2) whether the other indebtedness allegedly covered is of the same class as the debt referenced in the mortgage; (3) whether the other indebtedness was intended to be separately secured; and (4) whether the mortgagee relied on the clause in making further advances. Gibson, 249 B.R. at 655. These factors were drawn from an ALR Annotation analyzing the general law of American jurisdictions on this subject and while applied by one other Pennsylvania bankruptcy court, the test has not been adopted by any Pennsylvania state court. See In re Fassinger, 246 B.R. 513 (Bankr. W.D. Pa. 2000).

## B.  Note III

I begin my discussion with the financing that was the focus at trial.[14]  The advances under Note III provided a revolving line of credit to Metro in the same principal amount as existed under Note I.  The Open-End Mortgage expressly contemplates that it would continue to secure all amounts payable under Note I "together with all renewals of, extensions of, modifications of, consolidations of and substitutions" for Note I.  GPCC contends that is precisely what Note III represents.  Debtor, on the contrary, argues that Note III evidences a new loan because the proceeds of Note III were applied to satisfy Note I.

The testimony established that while there was no new loan application, a complete new set of documents, i.e., promissory note, line of credit agreement, corporate authority, disclosure for confession of judgment, were executed.  However, Campbell testified that the new documents were necessitated after the merger of Progress into Fleet by Fleet's internal policy regarding employment of its form loan documentation.  Thus, Note III reflects Fleet's use of a demand note while Note I evidences Progress' practice to employ a hard maturity note.[15]  According to Campbell, although demand in nature, Note III was most likely rolled over for another year and it was viewed as a renewal.  While Campbell views Note III as a renewal of Note I and Plaintiff contends that the satisfaction of Note I precludes that characterization, I conclude that the precise label to be affixed to Note III is not dispositive

---

[14]  Based on the record made, I was not even sure that Note II was at issue.  However, the Complaint and briefs clarified the point.

[15]  Progress issued one-year renewable notes.  Note I which matured on April 30, 2004, is, according to Campbell, for a ten month period to harmonize with Metro's fiscal year.  It was extended to June 29, 2004 by Fleet.  Exhibit P-29.

here where it is clear that by the additional language contained in the Open-End Mortgage, the partes intended that the lender's obligation to advance under a revolving line of credit continue to be secured by the Residence.

In any event whether Note III represents a new loan, a renewal of or substitution for the loan evidenced by Note I, there is no doubt that both Notes reflect indebtedness of the same purpose and class, i.e., a line of credit issued to Metro. Note III incorporates a Line of Credit Agreement of even date which evidences a line of credit for Metro's short term borrowing needs with a credit limit not to exceed $375,000, the same amount of the indebtedness under the line of credit memorialized by Note I. Exhibits P-30 and P-31. The Marques had always provided a mortgage on their Residence to secure Metro's line of credit,[16] and there was no request or discussion of releasing it at the time Note III was executed.

The thrust of Plaintiffs' case is the omission of a reference to the Open-End Mortgage in the Line of Credit Agreement executed with Note III. The express terms of the Line of Credit Agreement recite the security for the loan which supplements the business collateral. Contrary to the Business Loan Agreement accompanying Note I which identifies as security the Collateral Pledge Agreement **and** Open-End Mortgage, the Line of Credit Agreement references only the Pledge Agreement. Compare Exhibit P-1 at 4 with Exhibit P-31, ¶ VI. While Campbell testified that he would not have recommended the loan without the real estate collateral given the nature of Metro's receivables and the company's leveraged

---

[16] Note I paid off Metro's indebtedness under a factoring arrangement with Penn Business Credit, Inc. that provided the same maximum amount of funding for operations and was secured by a mortgage on the Residence. Exhibit P-3.

-13-

assets, he does not explain why the Line of Credit Agreement expressly recites additional security provided by the Pledge Agreement and not the Open-End Mortgage. The omission suggests an intention to continue to hold the Securities as collateral but not the Residence. Plaintiffs bolster their argument by the recent satisfaction of the Open-End Mortgage by B of A. Since GPCC did not offer any evidence as to why another officer at B of A directed counsel to mark the Open-End Mortgage satisfied, Plaintiffs' inference that B of A did not view it to secure the other loans is certainly possible although undermined to some extent by by the demand letter B of A sent to Metro on July 8, 2005 in which it recites the security for Note III to include the Securities <u>and</u> <u>Residence</u> as evidenced by the Pledge Agreement and <u>Open-End Mortgage</u>, respectively. Exhibit P-35. This document suggests that B of A did not consider the satisfaction of the debt under Note I to have extinguished the lien of the Open-End Mortgage when it previously satisfied Note I and documented Note III.

Fortunately, given this inconclusive record, my decision does not turn on whether Fleet intended that the Open-End Mortgage continue to secure Note III since it is the parties' intention when the collateral was granted that controls.[17] As stated by the Court in <u>Marine National Bank v. Airco</u>, 389 F.Supp. 231, 234 (W.D. Pa. 1975):

> [i]t is the intent of the parties to the security agreement that controls: was the indebtedness reasonably within the contemplation of the parties; and, are the transactions reasonably related?

<u>Id.</u> I have concluded that the replacement nature of the loan evidenced by Note III supports the conclusion that the parties to the Open-End Mortgage intended that such a loan would

---

[17] Thus, GPCC's incomplete record on this point is not fatal. If the parties' intentions at the time of future advances were relevant to establish the enforceability of a dragnet clause, GPCC would have had the burden since it must prove the extent of its security interest.

-14-

continue to be secured by the Open-End Mortgage, just as it had previously secured the Penn Business Credit line of credit which Note I replaced. The parties to the Open-End Mortgage were Progress, Anthony and Elena. There is no evidence that a satisfaction of the mortgage was requested by Plaintiffs; indeed no one seems to have discussed or even focused on the mortgage when Note III and the other documents were prepared. The fact that Fleet's documentation omitted reference to the Open-End Mortgage may be, like the recent satisfaction, intentional or an oversight. However, it is clear to me that the parties to the mortgage reasonably contemplated it would attach to the loan indebtedness created by the repayment of the prior line of credit. Given the existence of a valid mortgage lien to cover these new advances, the fact that Fleet did not know or did not document the existence of its continuing mortgage is not dispositive. Absent documentation sufficient to create a release of collateral, of which there is no evidence, the omission of a reference to the Open-End Mortgage in the new loan agreement does not defeat a validly created lien.[18]

### C. Note II

As far as Note II is concerned, other than the broad dragnet language, no case can be made that there is any specific or even oblique reference to it in the Open-End Mortgage. GPCC refers to the definition of Related Loans in the Open-End Mortgage which broadly embraces all promissory notes and loan agreements, whether now or existing, executed in connection with the Indebtedness. Indebtedness, as noted, refers to all amounts payable under the Note or Related Documents, a circularity of drafting that does nothing to enhance

---

[18] I therefore reject that part of the Gibson four-factor test that looks to whether the mortgagee relied on the clause in making further advances. See note 14 supra.

the generality of the Cross-Collateralization Clause of the Open-End Mortgage. On the contrary, as noted above, the Open-End Mortgage clearly contemplates securing a revolving line of credit, the debt memorialized by Note III. Since SBA authorization for the guarantee of the Note II was obtained within one month of the closing on Note III, Exhibit P-12, one would expect some reference in the documentation that evidenced the parties' contemplated inclusion other than the broad and general language quoted by GPCC, that the Open-Mortgage secure Note II.

Aside from the relatively contemporaneous nature of the two transactions, Note II and the other documents memorializing the $650,000 term loan establish that it was intended to be a separate and unrelated course of financing from the line of credit evidenced by Note I and then Note III. Fassinger, 246 B.R. at 525 (notwithstanding that all loans were consumer transactions, where they were consummated by separate loan documents with separate repayment schedules and intended to purchase discreet items of personal property, loans were unrelated). Note II is actually a Small Business Administration note as to which Progress was the lender and SBA, the guarantor of 75% of the debt. Exhibit P-12. The purpose of the second loan was to refinance Metro's equipment and provide some additional working capital. Note II requires payments of principal and interest to amortize the Note in contemplation of a ten year maturity. Exhibit P-16. The SBA authorization of the guaranteed loan has a totally unique set of contingencies imposed upon Progress including compliance with all SBA's standard operating procedures and making all disbursements within one year. It requires a first perfected security interest in Metro's equipment to be appraised at a fair market value of $1.3 million and a guarantee by Anthony and the Trust

-16-

that owns Metro. While Progress supplemented the SBA documents with its own Business Loan Agreement,[19] it is silent about any personal collateral or undertaking by Elena in her personal capacity.

In Potomac Coal, the Pennsylvania Superior court reasoned that "[n]ormally, loans are considered related if the loans have been secured to provide working capital for the same business." 451 Pa. at 299. In making this statement, Potomac Coal relied on Marine National Bank v. Airco, 389 F.Supp. 231, 234 (D. C. Pa. 1875), which found that a loan consolidating and extending a prior loan was of the same class since both were intended to provide working capital. In Potomac a 1988 term loan was found to be related to a 1984 line of credit. In both cases, the cross collateralization spread to include business assets for business debts which were reasonably contemplated to be included. While the loans evidenced by Note I and Note II share the same general purpose, i.e., to provide a business loan, I believe that the "normal" rule articulated in Potomac Coal should not be applied because even if the class of debt is broadly the same, the financing arrangement which relies on an SBA guarantee is quite different.

In order that future advances be covered, they must not only be of the same class but so related that consent can be inferred. Here GPCC seeks to reach the Residence for a business debt that, unlike the line of credit, had never been secured by personal collateral.

---

[19] This agreement was prepared for signature by Anthony in his corporate capacity. Since the version placed into evidence is unsigned, I do not know whether the Cross-Collateralization Clause therein was initialed as contemplated. Exhibit P-17. In any event, it does not cross-collateralize to the Open-End Mortgage. Indeed all documents relating to the SBA loan are unsigned. As there was no objection by any party to their inclusion in the record, I will assume they are final and authentic.

A primary purpose of the loan was to refinance equipment which presumably was and continues to be the collateral relied upon to secure this obligation. I am unable to conclude that Anthony, and especially Elena, ever intended that their Residence would stand as additional security for the SBA Note. The close timing of Note I and Note II as separate transactions and the SBA guarantee of Note II negate drawing an inference of consent. Nor is there any evidence that Progress intended to secure Note II with the Residence. In contrast to Campbell's testimony that the line of credit Note III would not have been granted without the security of the Residence, he was not even questioned about Progress' intentions regarding the securing of Note II.

For the foregoing reasons, I find that the Open-End Mortgage secures Note III but not Note II. Accordingly, I will turn to Plaintiff's alternate theories regarding the enforcement of the mortgage lien as to Elena.

### D. Enforceability of Open-End Mortgage as to Elena

Plaintiffs contends that the Open-End Mortgage is not valid because Elena received no consideration for the debt secured thereby. The burden is on the party attacking the mortgage to prove lack of consideration. In re Dolata, 306 B.R. 97, 119-20 (Bankr. W.D. Pa. 2004).

It is undisputed that the advances made by Fleet were to provide financing to Metro and that Elena was not a party to any of the loan documents or a guarantor of either Note. Her sole commitment was to grant the security interest and mortgage in the Securities and

Residence which she and Anthony own as tenants by the entireties.[20] It is also undisputed that Anthony was a guarantor of the corporate loans. Exhibit P-7 and P-19.

Plaintiffs acknowledge that under Pennsylvania law, a mortgagor need not be bound on a note to create a valid mortgage. Plaintiffs' Post-Trial Memorandum of Law at 6-7 (*citing* Farris v. Jefferson Bank, 194 B.R. 931- 940-41 (Bankr. E.D. Pa. 1996)).[21] Thus, the absence of Elena's signature to Note II and III or her failure to act as a guarantor is not relevant. Plaintiffs provide no evidence that Elena received no consideration for her undertaking to encumber her interests in the Securities[22] and Residence nor any legal authority to establish the quantum of consideration they view as required to support a spousal mortgage. On the other hand, Pennsylvania law has long been that a married woman may mortgage her real estate as security for a debt of her husband. Hanover Trust Co. V. Keagy, 6 A.2d 786 (Pa. 1939); Cooper v. Lucas, 33 A.2d 466, 467 (Pa. Super. 1943) (*citing* cases). Indeed, that Pennsylvania law allows a mortgage to be created "'without any accompanying personal obligation or evidence of indebtedness of the mortgagor,'" Farris, 194 B.R. at 939 (*quoting* In re Morrison, 69 B.R. 586, 590 (Bankr.E.D.Pa.1987)), belies Plaintiffs' unsupported

---

[20] While all the shares of Metro are held by the Elena M. Marques Trust, she is neither the trustee nor a beneficiary. Exhibits P-40, P-41.

[21] Yet they then strangely argue, citing the Uniform Commercial Code, that to create a security interest value must be given and as neither Marques were debtors at the time Note III was issued, there was no value. They also argue, again citing inapposite case law, that no security interest can attach to property where the debtor does not have an interest. As there is no dispute that Elena has an interest in the Residence, I fail to understand this argument.

[22] Plaintiffs have not challenged the lien on the Securities but rather allowed this property of Elena to be liquidated to pay the business debt.

assertion that consideration for Elena is even required. In any case, the burden is theirs on this issue and they have failed to meet it.

**CONCLUSION**

Having granted GPCC's demand for reinstatement of the Open-End Mortgage and finding no merit to Plaintiff's lack of consideration theory, the mortgage lien against the Residence is enforceable to secure the outstanding indebtedness evidenced by Note III but not Note II. A judgment order shall be entered so providing.

DIANE WEISS SIGMUND  
United States Bankruptcy Judge

Dated:  September 16, 2008